## JOSEPHINE (A SLAVE) *v.* STATE, 39 Miss. R., 613.

### HOMICIDE.

Upon the trial of an issue of a plea of *autre fois acquit* to an indictment for murder by a jury, it is not necessary to ask them if " they have formed or expressed an opinion in regard to guilt or innocence of the prisoner." It is sufficient if they have not formed or expressed an opinion in regard to the question in issue.

The circuit court has no power to discharge a jury when *they say* that they cannot agree. But the court has the power to discharge them when there is a necessity for it, as where the term of the court was within a few minutes of its expiration when the jury returned into court and made known their inability to agree, and were discharged.

It is not necessary that there should be an *actual, positive, pressing necessity*, in order to give the court power to discharge the jury; it is sufficient if, in the opinion of the court, there is a *legal necessity* for so doing.

An erroneous ruling of the court, which, under the evidence of the case, could have no effect in procuring the verdict which is rendered, is immaterial, and, therefore, no cause for reversal.

The rule is well settled at common law, that when in an indictment for murder a person is charged as principal, the jury cannot convict such person as accessory before the fact. 1 Leach, 515; 1 East, 352; Rex v. Plant, 7 Carr. & P., 575; 12 Ala., 458.

Rev. Code, 44, art. 6, provides that no indictment pending before the adoption of the Code should be affected by its provisions not in force before its adoption. Therefore, Art. 2, p. 572, of the Code, which provides that " every person who shall be an accessory to any murder or other felony before the fact, shall be deemed and considered a principal, and indicted and punished as such, and this whether the principal has been previously convicted or not," does not apply to cases where the indictment was found before the adoption of the Code.

Where an instruction which is erroneous is given upon a material point in the cause, a judgment rendered in accordance with it will be reversed, unless it manifestly appear from the whole record that no prejudice was done to the party complaining, and that the judgment was clearly correct. *Semble:* Especially in cases of circumstantial evidence is this rule applicable.

On the trial of a slave for the murder of one of her master's family, it is competent for the state to prove by the master the prisoner's conduct and deportment towards witness, his wife, or his family ; what she may have said expressing content or discontent towards him or his family, and of her situation, and condition of kindness or unkindness towards himself and family, and all acts of obedience or disobedience, subordination or insubordination, in the witness' family, to show the state of feeling of the prisoner, and as connected with the question of motive on her part to commit the deed charged against her.

Where there is no evidence tending to connect another party with the killing, and no fact going to show that such person had an opportunity to commit the act, testimony that such other person had made statements in relation to a previous poisoning, and her intention to commit the crime again, is clearly irrelevant, and should not be admitted. So also is a proposed examination of a witness as to his having had sexual intercourse with such other person.

On the trial of a slave for poisoning one of her master's family, it is competent for her to prove, in regard to the question of intent, that her master had been in the habit of sexual intercourse with her.

Statements made by the prisoner on the trial of another person charged with the same offense as himself, for which he is indicted, is not admissible in evidence against him.

The following entry on the minutes of the court: "The grand jury, elected, empaneled, sworn and charged at the present term of the court, this day returned into court the following bill of indictment:

| | |
|---|---|
| THE STATE, | *Indorsed:* A true bill. |
| 173     *vs.* | James B. Smith, foreman of the grand jury. |
| JOSEPHINE (a slave), | No Prosecutor." |
| GEORGE (a slave). | |

Is sufficient to show that an indictment for murder, marked "filed," by the clerk, against the above named parties, and numbered and indorsed as above, was legally returned into court by the grand jury.

All objections to the indictment must be made before plea of "not guilty." Then, after the plea of not guilty has been entered, it will not be error for the court to quash an indictment for misjoinder of counts, or to refuse to compel the state to elect which count upon which to try the prisoner. George v. State, *supra.*

The statute Rev. Code, 250, which provides that in all cases not capital, slaves shall be tried by two justices of the peace and five slaveholders, does not apply to capital cases.

Error to Bolivar circuit court. YERGER, J.

At the May term, 1857, the plaintiff in error was indicted jointly with a slave named George, for the murder of Lelia Virginia Jones, by poisoning. The murder was alleged to have been committed on February 27, 1857. At the November term, 1857, of the court, the plaintiff in error was tried separately, and the jury failing to agree were discharged, and a mistrial entered by the court five minutes before the expiration of the term of the court prescribed by law. At that term another indictment was found against both George and plaintiff in error, upon which they were both subsequently tried separately. A *nolle prosequi* was entered on the first indictment in March, 1858.

The last indictment contained two counts. The first count charged plaintiff in error and George[1] (a slave) with the murder of Lelia Virginia Jones, by poisoning; and the second count charged Josephine as principal, and George as accessory before the fact. The prisoner filed to this indictment two special pleas in bar, which alleged a former discharge of the jury by the court, and a mistrial, and in the conclusion of both pleas, averred that such mistrial and discharge of the jury operated as an acquittal of the defendant from the charges alleged against her.

[1] See case of George v. State, *supra.*

Appended to these pleas was a certified copy of the first indictment against George and Josephine, and for which they were put on trial in November, 1857, and which was *nol. pros.* in March, 1858.

To these pleas the district attorney replied, denying that the defendant had ever been acquitted or put in jeopardy.

By consent of all the parties a severance was had.

At the November term, 1858, the plaintiff in error asked for a continuance, which was refused, and she excepted; and a trial was then had on the special pleas.

On the trial of these pleas the record of the proceedings in the former indictment was introduced by the prisoner, showing a regular indictment against her and George, in which she was described as a negress slave, for the murder of Lelia Virginia Jones, by poisoning; her plea of not guilty; the empaneling of the jury to try her on the 3d day of November, 1857; and the continuing of the trial, from day to day, till the seventh day of that month.

The record recites, that on the sixth day of the term, the jury "returned into court five minutes before twelve o'clock, P. M., and say they are unable to agree upon a verdict, and were thereupon discharged by the court, and a mistrial ordered to be entered in this case, and that the same be continued."

The following facts were then admitted by both the state and the prisoner: "That the prisoner is the identical person who was put upon her trial, as in the pleas filed is alleged; that the offense for which she was so put on her trial, is the same identical offense charged in the indictment under which the present trial is going on; and that the testimony on the former trial was the same, and in relation to the same offense, as that to be used upon the issue of not guilty under the indictment under which the present trial, at the November term, 1858, is taking place; that there are many races of pure African negroes who are of lighter complexion and more European cast of countenance than the prisoner."

Upon the trial of this issue, the defendant asked the court to instruct the jury as follows:

1. "That the discharging of the jury heretofore empaneled

to try the prisoner was illegal, if the jury believe from the evidence that the prisoner was so put upon her trial under a valid indictment, and could have been convicted upon any evidence which might have been introduced; and whether such evidence was or was not introduced on said former trial as immaterial, unless a necessity absolute for such discharge existed."

2. " That, in a capital case, the court has not the power to discharge a jury, after all the evidence is given, and the case closed and submitted to a jury, without their having rendered a verdict, upon the ground that the jury say ' they are unable to agree upon a verdict;' and such a discharge would operate as an acquittal of the prisoner."

" That the court has not the power to discharge a jury in a capital case, after the evidence is closed and the case submitted to them, unless such discharge is made upon some actual, positive, pressing necessity; and if such jury is discharged for any other cause, the prisoner is acquitted."

" That the mere fact that the term of the court was about to expire is not such a necessity as will justify the court in discharging a jury in a capital case, when the evidence for and against the prisoner is closed, and the case has been submitted to a jury to consider of their verdict."

" That it is within the judicial cognizance, and is true, that there are many races of African negroes who are of a lighter complexion and of more European contour of face than the defendant."

The court refused to give the charges as asked, but in lieu thereof gave the following :

1. " If the jury believe, from the evidence, that the defendant was put upon her trial for the same offense for which she now stands indicted, upon a good and valid indictment, under which she might have been convicted, and that the court, without a sufficient legal necessity, discharged the jury, then such trial and discharge of the jury, if made without such sufficient legal necessity, would operate as a bar to further prosecution under the present indictment, and they should find the issues for the defendant; but if the jury believe, from the evidence, that such discharge was made on a sufficient legal necessity, such dis-

charge would not operate as a bar to the further prosecution of defendant under the present indictment, and they should find the issues now before them against the defendant, and in favor of the state."

2. "In a capital case, the court has not the power to discharge the jury, after the evidence is given and the case closed and submitted to the jury, without their having rendered a verdict, upon the ground ' that they say they are unable to agree upon a verdict;' and such discharge upon that ground alone would entitle the defendant to a discharge, and would operate as an acquittal; but the court has the power to discharge the jury in such a case, where there is a legal necessity for so doing."

3. " The court has not the power to discharge a jury in a capital case, after the evidence is closed and the case submitted to them, unless such discharge is made on account of some legal necessity; and if the jury are discharged without such legal necessity, the prisoner would be entitled to a discharge, and could plead the same in bar of a further prosecution for the same offense."

4. " The jury are instructed that the fact that the term of the court was about to expire by limitation of law within a few moments, without the jury having agreed on a verdict, is such a legal necessity as will justify the court in discharging a jury in a capital case, when the evidence for and against the prisoner had been given, and the case submitted to such jury to consider their verdict."

At the instance of the state, the following instructions were given :

1. " In the trial of a criminal case for felony, although it be capital, the court trying the case has the power and authority, without the consent of the defendant, to discharge the jury empaneled to try the case, and order a mistrial to be entered in case of necessity.  And if the jury believe, from the evidence, that on a former trial of the defendant in this case, on indictment for the same offense, the jury charged with the trial of the case did not and could not agree upon a verdict, and within five minutes or within a few minutes of the close and expiration of the last hour of the last day on which the court could legally

sit, appeared in court and reported to the court that they had not and could not agree upon a verdict in the case, and the court thereupon, and not until then, and because the term of the court was about to expire, and because the jury could not and did not agree upon a verdict within the time limited by law for the continuance of the court, discharged the jury, and directed a mistrial to be entered in the case, it would be such a case of necessity as the law contemplated for the exercise of the power to discharge the jury, and would be a sound and legal exercise of the discretion of the court; and such discharge of the jury and entry of the mistrial would not operate as an acquittal and discharge of the defendant, nor of putting of defendant in jeopardy of life or limb for the offense on which she was tried, so as to preclude and bar a subsequent trial on the same indictment, or a trial on the present indictment, though it be for the very same offense; and if the jury so find the facts to be on the present issues, they should find their verdict for the state and against the defendant."

2. " If the record of the former trial, read in evidence in this case, satisfies the jury that the court did discharge the jury charged with the trial of the indictment against the defendant for the same offense included in the present indictment, and order a mistrial to be entered, the law presumes that the jury are compelled and required to receive that record as conclusive evidence of the fact (if there be nothing in the record itself to contradict that presumption of law) that the court properly exercised its discretion, and that a case of necessity for the discharge of a jury had arisen; and such discharge would not operate to discharge the defendant, or bar a further prosecution for the same offense under the present indictment."

3. " If the jury believe, from the evidence in this case, that the court discharged the jury, on a former trial of this defendant, in a case of manifest legal necessity, even though they had agreed in their verdict, they must find the present issues for the state, and against the defendant."

The defendant proposed to ask each of the persons summoned to try the issues on the special pleas, " Whether he had formed

or expressed an opinion of the innocence of the said defendant of the crime of murder charged in the indictment?"

The court refused to allow that question to be propounded, but allowed the following question to be asked each of the jurors: "Whether he had formed or expressed an opinion in relation to the issues on the special pleas filed by defendant; and whether he had formed, or expressed, or held any personal bias, animosity, or ill-will, or good-will, to said defendant."

The state moved to empanel a jury to try all of the issues, as well that on the plea of "not guilty" as those on the special pleas filed by defendant; but on objection, this course was not allowed, and a jury was empaneled to try the issues of the special pleas.

The verdict on the issues was for the state.

At the October term, 1859, the prisoner moved the court to quash the indictment, for misjoinders of counts. The motion was overruled, and the prisoner then moved the court to compel the district attorney to elect upon which of the counts in the indictment the state would rely upon for trial. This motion was also overruled, and exception taken.

Afterwards, at the same term, the defendant moved the court to quash the indictment because no prosecutor's name was marked upon it, it appearing from the indictment that the offense was committed on the 27th of February, 1857, before the Revised Code, which allows indictments to be returned without a prosecutor, went into operation. This motion was also overruled, and exceptions taken.

At the April term, 1861, the defendant was put on her trial on a plea of "not guilty." She objected to go to trial, because a list of the special *venire* and a copy of the indictment had not been served on her, as the law directs. This objection was overruled. She then applied for a continuance, which was refused. She then moved to quash the special *venire facias*, which was refused. She then challenged the array of the panel summoned on the special *venire facias*. The challenge was overruled. She then asked leave to file a plea in abatement to the special *venire*, which was refused. The grounds upon which these pro-

ceedings were predicated need not be set out, as this court expressed no opinion in reference to them.

After the jury was empaneled, the district attorney proposed to read the indictment to the jury, and the defendant objected, because there was no record of this court of the finding and return of said indictment, and because the record is insufficient and uncertain, &c. [This objection was the same as that made on the motion in arrest of judgment, and the proceedings connected therewith will be hereinafter fully set out in connection with the said motion in arrest of judgment.] The objection was overruled, and defendant excepted.

The state then introduced Lafayette Jones, who testified as follows: That Josephine was his slave; that on the 27th December, 1857, witness and his wife and little daughter, Lelia Virginia, about fourteen months old, and his son and a Mr. Forbes, ate dinner at witness' house. There was tea for dinner. Witness' wife poured out a cup of tea, and handed it to the nurse for the little daughter, who drank of it, and witness and witness' wife also partook of the tea; but his son and Forbes did not. Before the child Lelia Virginia finished drinking the tea, she commenced vomiting. Witness took the child into another room, and then commenced vomiting himself. Witness became alarmed, and immediately took the teapot and locked it up in the parlor. On a former trial witness had forgotten what he did with the teapot. After witness' wife commenced vomiting, he sent for the overseer, and told him to arrest Josephine, which he did, and tied her and put her in a room. Shortly after witness sent for overseer, was taken very sick, and vomited a great deal. Witness soon after went to bed, and don't know what took place afterwards, except that the child kept vomiting. Dr. Mason was called in to attend to the child, Mrs. Jones, and witness. Forbes and witness' son, who did not partake of the tea, were not sick. Witness does not know who cooked dinner that day; the food on the table was such as was commonly on at dinner. Prisoner was in the kitchen that day, and had been in it for several days as cook.

Witness had bought her in New Orleans, about two weeks before that time. Witness had whipped Josephine on that

morning (27th February, 1857), for some illegal impudence to Mrs. Jones.

The court permitted witness, against the objection of defendant, to testify " that at the trial of George under the present indictment, Josephine testified as a witness, and then and there stated that, when she was coming up from New Orleans on the steamer Ingomar, she took from a girl on the boat some free papers." Defendant excepted.

The state then asked the witness, " What was the conduct and manner of Josephine from the time he bought her in New Orleans up to 27th February, 1857?" Defendant objected to the question. The court overruled the objection, holding that the state might ask the witness about the general and particular conduct of prisoner towards witness or his wife or family from the time he bought her till the 27th February, 1857; and also might ask witness what the prisoner said during that time, expressing content or discontent towards him or his family, " or about her situation and condition, or kindness or unkindness towards himself or family;" and as to all acts of obedience or disobedience, subordination or insubordination, towards witness or his family, or their orders or commands. To this ruling defendant excepted.

Witness then, under said ruling, stated that after he bought her in New Orleans, she manifested an unwillingness to leave that place, not by any word or words, but by crying and " taking on considerably." Upon being asked what was the matter, she said some of the negroes in the yard had stolen some of her jewelry. Witness and Josephine came from New Orleans on different boats. Witness can't say that he ever heard her say or saw her do anything to make witness believe that she was dissatisfied. She did not move about witness' house with the life and sprightliness she did in New Orleans. Witness whipped defendant after breakfast that morning (27th February, 1857). She appeared vexed about the whipping, throwing her head around to her shoulder to see a cut made by the whipping. Witness don't know whether he whipped her with a cowhide or switch.

Cross-examined.—George, jointly indicted with Josephine,

and two little negroes and prisoner, were at witness' house on 27th February, 1857. George was working about the yard.

Witness employed counsel to prosecute defendant, viz., Gov. F. and Messrs. B. & S., and to defend George.

Witness' wife treated Josephine kindly. Defendant never disobeyed witness. The inclosure around witness' house includes less than an acre. George was working about the yard-fence the day of the poisoning, his (George's) house being near the fence. George had been an invalid (from rheumatism) for twelve or eighteen months prior to that time. A few days previously witness had told the overseer to make George go to laying off corn-rows with a plow. George was without a wife at the time. He once had Becky for a wife, and she was then on the place.

Witness then owned a slave named Elsey, whom he had owned since 1838. She was then on the place, and had been witness' cook; and had been turned out into the field but a short time before the 27th of February, 1857. Elsey was mother of witness' slave Lethe, who was mother of a mulatto child about eighteen months old on 27th February, 1857. Lethe was then on the place.

Witness then owned and had on his place a slave (mulatto) aged about twenty years, named Eliza, who is a witness in the case.

Witness does not remember saying he would spend half of his fortune to convict defendant.

Witness never whipped her but that one time: the whipping was not severe. Witness was married to his present wife in Madison parish, La., in 1855.

Witness was then asked by defendant, " Did you, shortly after your marriage to your present wife, and whilst in Madison parish, have the woman Elsey, your slave, and the woman slave of yours above spoken of by you, arrested and tied, and so kept for several days, upon a charge made by you that she had poisoned your first wife, and that Elsey had said shortly before she had been arrested, " I have put my first mistress under the ground, and will soon put the new one there;" and had you so kept her tied, deliberating whether or not you should deliver them to the officers of the law for prosecution?"

"Have you, before the 27th February, 1857, for some years been in the habit of sexual intercourse with the said woman Lethe, the daughter of Elsey, and are you the father of her mulatto child?"

"Have you, before the 27th February, 1857, for some time been in the habit of sexual intercourse with your said slave Eliza, who is to be a witness in this case?"

"Did you, in New Orleans, and on the afternoon of the day before the day you whipped defendant as aforesaid, have sexual intercourse with her?"

To which several questions the state objected. The court sustained the objection, and defendant excepted.

Mrs. Lafayette Jones, for the state, testified that breakfast was cooked badly on the morning of the 27th February, 1857, and she talked mildly to defendant about it, who replied impudently and saucily. She informed her husband of this impudence, and he whipped her. Shortly afterwards witness went to the kitchen and called defendant. She did not reply, and turned her back on witness, and made a face at witness, and turned over a chair. Witness then procured the overseer to whip her. In an hour or two afterwards witness went to kitchen and asked prisoner to go with her to the smoke-house to get out dinner, which she did, and then seemed to be in a good humor. At dinner, tea was on the table, and it was drunk by witness' daughter, Lelia Virginia Jones, and by witness, and Mr. Jones. The daughter was about twelve months old, and in good health. Before dinner was over the child commenced vomiting, and so continued for several hours, when she died. Witness tried to give her oil and milk, but she was so sick, and vomited so much, that she could not swallow them. The child vomited up a frothy matter. Witness soon after dinner became sick herself, and vomited a great deal. Witness did not recover from her sickness for two years. Witness had cramp in her stomach after taking the tea, and great thirst.

Defendant was cook, and had been for a week. There was no other cook there while she was in the kitchen. The kitchen was ten or twelve steps from the house. It could not be seen from the witness' room, but could be seen from the gallery

Cross-examined.—Mary (a slave) was sick in her bed at some distance from the kitchen. She had been taking medicine that day. Witness waited on her; no one else stayed with her. Some of the negroes—Tom (Mary's husband), Charles, and Rose—stayed in Mary's house. On that day the negroes were planting potatoes up the river, above and joining the garden, which is square, and contains less than an acre of ground, and adjoining the yard, which is also small, and contains less than an acre. Elsey and Lethe were planting potatoes with the other negroes.

Witness gave prisoner five new dresses—four of calico and one of lawn. Witness had tea frequently for dinner, but did not order it that day. When witness wanted tea it was always ordered. George and Forbes had been working near the house. Don't recollect to have seen George about the kitchen that day.

Dr. C. R. Mason, for the state.—Is a practising physician, and has been for seven years, and is a graduate of a medical college. When he arrived at Jones' on 27th February, 1857, his child, Lelia Virginia Jones, had thirst and spasmodic action of the extremities. Jones complained of dryness about the mouth, thirst, and vomiting. Mrs. Jones was "more mentally excited than otherwise." Witness thought from the symptoms the family were poisoned with arsenic, and such is his opinion as a medical man; and he treated them accordingly. The child died about an hour after witness arrived.

The admissions made by defendant were excluded because they were procured upon his assurance that if she would tell all she knew of the matter, witness would get her off on a steamboat; but he was permitted to state, and did state, that being in the room where the prisoner was confined, he went with her to Forbes' room by her direction, and there in the ashes found a fragment of a glass vial partly fused by heat. He could not tell from said fragment the size of the vial of which it was a part. It appeared to have been a part of a small vial, or it might have been a part of a four-ounce vial. Did not know such fragment was in the fire-place before.

Cross-examined.—There are many diseases, the symptoms of which closely resemble those of poisoning by arsenic, such as

*gastritis, gastro-enteritis,* and Asiatic cholera. Cannot say positively that Jones' family were poisoned, but think they were, and with arsenic.

Eliza (a slave), for the state.—She is a slave of Lafayette Jones. Witness was, on the day of sickness or poisoning, at work in the field, picking up corn-stalks. On the Monday or Tuesday night before the poisoning, George was looking in his chest for tobacco, and took out a vial, which he said he had a long time, and gave it to Josephine. He said it was ratsbane or strychine, or something that would kill rats, and that he had no use for it. Prisoner said, " Give it to me," and thanked him for it, and put it in her pocket, and tried to read what was on it, but could not make out all the letters on it. Witness cooked her supper in George's house, and then went to her mother's house. George and Josephine were all that slept in that house. George did not say where he got the vial.

Cross-examined.—When George was looking into his chest, he said the overseer had told him to go to laying off corn-rows to-morrow, and he was not able to do it, and wouldn't do it, and that his master was getting tighter on him than he ever had been. That the vial was about as long as witness' finger, and not so thick; it was white, and had something white in it, which looked like flour. The above conversation was on Monday or Tuesday night, and the poisoning in the latter part of the same week. Witness never had a quarrel with the prisoner. Witness only stayed in George's room that night long enough to cook her supper, and then left, leaving George and Josephine there. Witness never had talked with any person, or with any of the negroes, about the poisoning or the vial, from that time to this.

George, a slave, and jointly indicted with defendant, and under sentence of death for said offense, testified for the state that he was hunting for some tobacco in his chest, and took out a vial and put it on the floor. Josephine says, " What is this ? " and took it, and nothing more was said about it. Witness found the vial in the mud in an overflow in Louisiana, where he was picking up some plows to put into an old storehouse. The vial was about two inches long and about one and a quarter inches

thick. Witness told Josephine he did not know what was in the vial, but it was " some medicine or stuff." Eliza was then holding a pine-torch for me. The night before the poisoning the witness was lying in his bed and awake, and he heard Josephine and Charles talking, while sitting on a chest on the outside of his house, about how they would get off. There was nothing between them and witness but a single-plank wall. Charles said he did not know how to fix the papers, and Josephine said she would have them fixed, and they would get a skiff and go to Napoleon, or go up the river. Witness did not see Josephine build a fire in Forbes' room on the day of the poisoning, but saw some chips there like some she had carried in from the wood-pile. When the lamentation was going on in the house, witness was at work in the yard, near the wood-pile, fixing up the palings. Charles was going towards the horse-lot, and defendant coming behind him; she said, " Charles, now I have ruined myself;" and he said, "Yonder's the overseer," pointing backward, and then she stooped down to pick up some chips. Witness did not see where she went, but saw the chips afterwards in Forbes' room.

Cross-examined.—When witness saw Charles tell Josephine "Yonder's the overseer," Charles was coming from the horse-lot, she was following him, and the overseer behind her, coming towards her. Witness was then outside the gate, in the lane, and was mending palings. Witness had not been in the kitchen that day but once, before the family took sick. He had been at the door, or put his foot on the door-sill, but did not go in. He did not know what was in the vial. That he had not recently, before 27th February, 1857, been sick, but was then well, and able to do most any kind of work; could work about heavy timbers. He had not worked in the field for some years.

Abram (a slave of Lafayette Jones) testified that on the morning of the 28th of February, 1857, he was in the room in which defendant was confined, and guarding her; he was holding the rope with which she was tied. Becky and Rany (two slaves of Jones) were in the room talking to prisoner, and asking her what made her do so. Becky was talking considerably in a loud tone to prisoner. Several of the negroes were in the adjoining

room, talking loud and making much noise. Becky was shaming prisoner for having done what was done, and prisoner said, "For God's sake, hush, people. You make more fuss about it than the white folks do. I am not the first one that did such a crime, by ten thousand." The negroes of the plantation were about the house and in the yard on the evening of the 27th February, 1857. There was much confusion that evening; all the doors were open and fires were in the rooms. Prisoner, when she said as above, "For God's sake," &c., was crying, and stopped crying to make the remark.

Raney (slave of L. Jones), for the state, proved on her direct examination the same facts stated by Abram, the last witness; but on cross-examination, she stated that the remark made by prisoner, "For God's sake," &c., as above testified, was in these words: "For God's sake, people, hush. *Even* if I had done it, I am not the first one that has done such a crime, by ten thousand." Witness further stated she was the wife of witness Abram, and on the day of the poisoning she was in the field plowing, the trash-gang picking up corn-stalks. The field-hands were not allowed to go about the kitchen.

Austin Dixon was then sworn for the state. Witness was overseer for L. Jones in 1854 and 1855, in Madison parish, La., and had under his charge, as such, slaves George, Elsey, and Lethe; that George, in 1854, showed witness a small vial, in which there was a white powder, and told witness he had found it on the road between Dallas and Jones plantations, which were six or seven miles apart.

Defendant proposed to question the witness in relation to the arrest by Jones of Elsey and other negro women on the charge of poisoning his first wife, and also the declaration made by Elsey on that subject, as she had proposed to examine said Jones; but on objection of the state, the court decided the testimony incompetent, and defendant excepted.

The state then proved by Joseph McGuire and his wife that the teapot used at dinner at Jones', on the 27th February, 1857, had been carefully preserved by them till June, 1860, when it was delivered by McGuire to Professor W. D. Moore, of Oxford.

Professor Moore stated that he had made an examination of said teapot so delivered; that there was then no fluid or tea-grounds in it, but there was a greenish brown crust on the bottom and part of the sides of said teapot; that, on submitting this crust to proper chemical tests, he procured the pure metal, arsenic, and then procured from the said pure metal octahedral arsenical crystals, or crystallized arsenic. Witness is a scientific chemist.

Defendant then proved by Joseph C. Rogers that he had been acquainted with her many years in Paducah, Kentucky; that she had been nurse in the families of witness' brother-in-law and father-in-law for some years, and that her character for kindness, humanity and amiability was good.

Charles (a slave of L. Jones), for defendant.—The witness denied the conversation testified to by George as having taken place between witness and defendant on the night before the poisoning, on the chest near George's house, and also denied the conversation to have taken place on the day of the poisoning at the wood-pile.

It was admitted that witness George had been convicted under the indictment, and that said conviction was affirmed by this court, and that he was under sentence of death under said conviction.

This was all the evidence.

The court, at the instance of the district attorney, instructed the jury as follows:

1. " That a person charged with crime may be convicted on circumstantial evidence as well as on direct and positive testimony. Great care and caution should be used by the jury in the investigation of such evidence. But where, after due care and caution in the investigation of circumstantial evidence, a full conviction of the minds and consciences of the jury of the guilt of the accused, to the exclusion of all reasonable doubt, is produced, the law authorizes, and they are warranted in acting upon it."

2. " Circumstantial evidence which satisfies the minds and consciences of the jury to the exclusion of all reasonable doubt is sufficient to justify conviction. Absolute, demonstrative cer-

tainty is not essential to proof by circumstances. It is sufficient if the circumstances produce moral certainty, to the exclusion of all reasonable doubt. The legal test of the sufficiency of evidence, either circumstantial or direct and positive, to authorize a conviction, is its sufficiency to satisfy the understandings and consciences of the jury, to the exclusion of all reasonable doubt, of the prisoner's guilt."

3. "To authorize the jury to find the defendant guilty of the crime charged, there should be evidence before them sufficient to satisfy their minds of her guilt beyond a reasonable doubt, arising from the evidence in the case. That which amounts to mere probability only, or conjecture, or supposition, is not what the law means by such a reasonable doubt as the jury would be warranted in giving the defendant the benefit of, and acquitting her upon the doubt. A doubt which should properly induce them to withhold a verdict of guilty, should be such a doubt as would reasonably arise from the evidence before them."

4. "That the laws of this state, and the laws which are to govern them in their investigation of this case, make all accessories before the fact to the commission of murder, principals, and punishes them with the same penalties imposed on principals. What the law means by 'an accessory before the fact,' is one who has guilty knowledge, and aids, assists, or abets another in the commission of a felony."

5. "That if the evidence in this case satisfies the jury, beyond a reasonable doubt arising therefrom, that the defendant, Josephine, administered arsenic, or had a guilty knowledge of, and aided, abetted, or assisted in the administration of arsenic, knowing the same to be poison, to Lelia Virginia Jones, and that the said Lelia Virginia Jones died from the administration of the same, as the indictment charges, the law presumes, from the act of the administration of poison by defendant, or her guilty knowledge of, and the aiding, assisting, or abetting of the administration of the same by any one else, so proven, that the defendant was actuated thereto by the motive of wilful malice (one of the essential ingredients of the crime of murder), and they should find the defendant guilty, as the indictment charges."

6. "That if the jury are satisfied, from the evidence in the case, that the defendant was guilty of the act of the administration of the arsenic, or aided in the administration of the same as an accessory, before the fact, to Lelia Virginia Jones, knowing that that arsenic was poison, the law presumes that her motive was malicious; and in order to warrant her conviction, the jury are not required to search the evidence before them for any other motive but her act or participation in the crime charged."

In the seventh instruction the jury were charged, that the prior conviction of George was no evidence of prisoner's innocence; that it only established the guilt of George as one of the principals or accessories before the fact, of said crime; and that if they were satisfied, beyond all reasonable doubt, that the said murder was committed by defendant and George, as principals, or by defendant as principal, and George as accessory before the fact, or George as principal, and defendant as accessory before the fact, they should convict.

The following are the instructions as asked by defendant, and as modified and given by the court:

1. "That, of all kinds of evidence, that of extra-judicial and casual declarations is the weakest and most unsatisfactory, and requires the greatest care in examination and application by the jury. This caution is to be particularly exercised where the party making proof of such declarations is known to have been influenced by angry feelings towards the defendant, or where the credit or reliability of the witness is impeached, or the time at which such declaration is made is remote."

In lieu of this, the court gave the following:

"That extra-judicial admissions or confessions are competent testimony for the consideration of the jury, as well in civil as in criminal cases. The jury, however, are to exercise the greatest care and caution in their examination and application. This care and caution should be particularly exercised where the proof in the case before them shows that the party proving such declarations, admissions, or confessions, is influenced by angry or unkind feelings towards the party charged with making such declarations, admissions or confessions, or when

the credibility or reliability of the witness testifying to them . is impeached by testimony in the case; *or* the nature and character of the admissions, declarations and confessions, or the facts and circumstances attending their making [This last sentence seems to be incomplete.—R.], or when the time at which they were made is remote."

2. "In the application of circumstantial evidence to the determination of the case, the utmost caution and vigilance should be used. It is always insufficient when, assuming all to be proved which the evidence tends to prove, some other hypothesis arising and growing out of the evidence in the case may still be true; for it is the actual, positive and absolute exclusion of every other hypothesis arising and growing out of the evidence in the case, which invests circumstances with the force of proof in the particular case."

Instead of this, the court gave the following:

2. "In the application of circumstantial evidence to the determination of a case, the utmost caution and vigilance should be used by the jury. It is always insufficient when, assuming all to be proved which the evidence tends to prove, some other reasonable hypothesis arising and growing out of the evidence in the case than the one sought to be established by the evidence may be true. It is the absolute, positive exclusion of every other reasonable hypothesis arising and growing out of the evidence in the case, than that sought to be established by it, that will authorize the jury to act upon it, and give to circumstances the force of truth in the particular case. But, whenever, after due care and caution in the examination of circumstantial evidence in a criminal case, a full conviction on the minds and consciences of the jury of the guilt of the accused, to the exclusion of all reasonable doubt arising from the evidence in the case, is produced, the law authorizes, and the jury should act upon it. Absolute, demonstrative certainty is not essential to proof by circumstances."

3. "In order to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts (facts showing guilt) must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon

any other reasonable hypothesis than that of the guilt of the accused."

This instruction was modified by the court by inserting after the words "reasonable hypothesis," the following: "arising from the evidence, or growing out of the proof in the case."

4. "The circumstances alleged as a basis of any legal inference, must be proved beyond doubt to exist, and must be shown indubitably connected with the main facts to be proved."

This instruction was thus modified:

4. "The circumstances alleged as the basis of any legal inference must be proved beyond doubt to exist, and must be shown by proof, satisfactory to the jury, to establish the main fact sought to be established by them, to the exclusion of all reasonable doubt arising from the evidence in the case."

5. "Before the jury can rightfully find the prisoner guilty, on circumstantial proof, that proof must be so absolute, conclusive, positive, and certain, as to exclude from their minds every other reasonable doubt that the crime may have been committed by some other person than the prisoner."

This instruction was modified by striking out "other," before "reasonable doubt," and inserting after those words, "arising from the evidence in the case;" and by adding to the instruction, "unless the proof satisfies the jury that such person was jointly concerned with the prisoner in the perpetration of the crime charged, or was accessory before the fact to its commission, or aided, abetted, or assisted in its commission."

6. "The probability of the prisoner's innocence, arising from the evidence, is a legal foundation for a reasonable doubt of his guilt."

This instruction was modified, by inserting "mere" before "probability," and appending to the charge "but a possible conjecture or supposition is not."

7. "To justify a conviction upon circumstantial evidence, it is necessary that the circumstances should be such as to exclude, to a moral certainty, any reasonable doubt of the prisoner's guilt."

This instruction was modified by appending "arising from the evidence in the case."

8. "If the evidence in the case leaves it indifferent which of several hypotheses, arising and growing out of the evidence in the case, is true, or merely establishes some finite probability in favor of the hypothesis of guilt, rather than another, such evidence cannot amount to legal proof of guilt, however great the probability may be."

9. "If the jury have a reasonable doubt whether the prisoner feloniously administered poison as charged, they must acquit."

This was modified by inserting after "reasonable doubt" the words, "arising from the evidence in the case."

10. "If the jury have a reasonable doubt whether the child Lelia died from the effects of poison feloniously administered by prisoner, or whether the child died from disease, or of accidental poisoning, they must acquit the prisoner."

This charge was modified as follows, by inserting after "reasonable doubt" the words, "arising from the evidence," and after the words "administered by the prisoner" inserting the words, "or by some one else, with her knowledge, connivance, assistance, and consent."

11. "If there is any fact established by the evidence irreconcilable with the guilt of the prisoner, although all the other facts and circumstances of the case may coincide and agree with the guilt of the prisoner, the jury will acquit the prisoner."

This was given as asked.

No instruction marked 12 is in the record.

13. "If, upon the testimony, the jury entertain a reasonable doubt whether there was arsenic in the tea which was used by the child at dinner, then, unless from the testimony the jury believe there was in said tea some other deadly poison, which was feloniously placed there by the prisoner, and so believe beyond a reasonable doubt, they will find the prisoner not guilty."

This instruction was modified by inserting after the words, "placed there by the prisoner," the words "or some one else by her aid, assistance, and connivance;" and inserting after the words "reasonable doubt," where they last occur in the instruction, the following: "arising from the evidence in the case."

14. "The *corpus delicti;* that is, the commission of the

offense, in this case is not merely the fact that the child died, but the death, and the fact of her death by poison feloniously administered, constitute the *corpus delicti;* and if the jury are not satisfied from the evidence in the cause, beyond a reasonable doubt, of the *corpus delicti* (that is, that poison was feloniously administered to the child Lelia, and that said child died from the effects of said poison so administered), they must find the prisoner not guilty."

This was given as asked.

15. "In criminal cases the mere union of a number of circumstances, each of which is inconclusive in its nature and tendency, cannot afford just ground of conviction, unless the combination be conclusive."

This was modified to read as follows: In criminal cases the mere union of any number of circumstances, each of which is inconclusive in its nature and tendency, cannot afford just ground for conviction, unless, when united and combined, they satisfy the jury of the guilt of the party charged, to the exclusion of all reasonable doubt. In such case they will afford just ground for, and authorize, a conviction of the party charged."

16. "Evidence of good character should uniformly have the effect to outweigh and overcome the mere testimony of an accomplice."

Modified so to read as follows:

"The evidence of good character of a prisoner should outweigh the evidence of a party charged as an accomplice, unless the evidence of such accomplice be sustained by the facts and circumstances proved by other testimony in the case."

17. "If the jury believe the testimony of the boy George is contradicted in any of its material parts by other unimpeached witnesses in the cause, it is their duty to disregard such parts of George's testimony, and they may in such a case disregard all his testimony."

Modified to read as follows:

"If the jury believe the testimony of the boy George is contradicted in any of its material facts by other unimpeached witnesses in the cause, they should disregard it, unless the facts

and circumstances proved in the case, or the evidence of other unimpeached witnesses, sustain and corroborate it. The jury are the judges of the credibility of his evidence, and may, if they believe it, act on it; or if they disbelieve it, may disregard it; or they may act on a part and reject a part, as they may think the facts and circumstances of the case, and the testimony in the case, warrant."

18. "The jury must discard absolutely from their minds every impression arising out of any thing, or act, or knowledge, except that derived solely from the evidence admitted by the court, and not from any impression derived from matters excluded by the court from them, upon objection thereto by counsel."

This was given as asked.

The verdict was, "Guilty as charged in the indictment."

The prisoner made her motion in arrest of judgment, upon the following grounds:

1. "That the record does not show that any indictment was ever returned and presented in the court against her and said George, or against her, by the foreman of a grand jury, in presence of twelve of the grand jury, including such foreman."

2. "The record shows no return of presentment of an indictment in this court against this defendant, or against this defendant and any other person, for the murder of any particularly named individual, or of any unknown person."

3. "The pretended indictment on which this defendant was tried, if it ever were found and returned in any manner to this court, was so returned while defendant was in custody of the sheriff of Bolivar county; and that said defendant has been in custody of said sheriff from the 4th day of March, 1857, until the present time, continuously."

The court overruled the motion, and pronounced judgment. The defendant excepted, and sued out this writ of error.

*F. Anderson* and *George V. Moody*, for plaintiff in error.

1. The act of the legislature of November, 1857, passed after the commission of the offense, making an accessory before the fact indictable as principal, does not apply to this prosecution. See on subject of retrospective and *ex post facto* laws, the fol-

lowing authorities: Sedgwick on Stat. and Const. Law, 191–196; Rev. Code, p. 44, art. 6; Id. p. 572, art. 2; Boyd v. Barringer, 23 Miss. R., 270; Garrett v. Beaumont, 24 id., 377; Dash v. Van Cleek, 7 Johns., 477; Calder v. Bull, 1 Cush. U. S. R., 271–273; 1 Kent Com., sec. 19, p. 381; Strong v. The State, 1 Blackf., 195, 196 ; Watson v. Mercer, 8 Peters, 110; Story on Const., sec. 1345; 1 Russell on Crime, 30, 31.

2. " The motion to quash the *venire* should have been sustained; so ought the challenge to array; and the plea in abatement to the *venire* should have been allowed." Rev. Code, p. 501, art. 142; Id., p. 613, art. 250; Id., p. 499, 500, art. 135–139; Woodsides v. The State, 2 How., 655; 1 Chitty Crim. Law, 537.

3. Prisoner's application for a continuance should have been granted. McDowell v. The State, 8 S. & M., 401; Franks v. Wangar, 25 Miss. R., 121; Weeks v. The State, 31 id., 500; Ogle v. The State, 33 id., 387.

4. On the question arising on the admission of the evidence of Jones as to what Josephine swore on the trial of George, and his evidence of her conduct, general and particular, towards his family; her acts of kindness or unkindness, obedience or disobedience, &c., see Dayson v. The State, 26 Miss. R., 362; Bowels v. The State, 24 id., 456; 2 Russell on Crime, p. 722, *et seq.;* Torrence v. Fisk, 10 S. & M., 595; Lake v. Munford, 4 id., 319; Dougherty v. Vanderpool, 35 Miss. R., 165; Dunlap v. Hearn, 37 id., 475; 1 Arch. Crim. Law (Watterman's notes), 393–395, 411; Id., 120, *et seq.*

*T. J. Wharton*, attorney general.

HANDY, J. :

The plaintiff in error was indicted at the May term, 1857, of the Bolivar circuit court, jointly with a slave named George, for the murder of Lelia Virginia Jones by poisoning, alleged to have been committed on the 27th February, 1857. At the November term, 1857, the plaintiff in error was put on trial separately; and after the testimony was closed, and the case submitted to the jury, and they had deliberated of their verdict,

they returned into court five minutes before the expiration of the last hour of that term of the court, and stated that they were unable to agree upon a verdict; and they were thereupon discharged by the court, and the case continued. At that same term another indictment was found against the parties for the same offense, and upon this they were tried separately, and at May term, 1861, the plaintiff in error was convicted, and the judgment rendered, which is now sought to be reviewed by this writ of error, a *nolle prosequi* upon the former indictment having been entered at March term, 1858.

This indictment contains two counts; the first charging Josephine and George as principals in the commission of the offense, and the second charging Josephine as principal and George as accessory before the fact. Various exceptions were taken, in behalf of the plaintiff in error, to the rulings of the court on the trial, and also to the overruling of her motion for a new trial, and of a motion in arrest of judgment.

The errors assigned are very numerous, and we will proceed to consider such of the assignments as are necessary and proper for us now to determine.

We will first consider the assignments of error having reference to the trial of the special pleas, which set up the trial at November term, 1857, and the discharge of the jury by the court, without their having found a verdict, as a bar to the second indictment, which was for the same offense, and relied on that trial as an acquittal. On the trial of the issue made by these pleas, the prisoner proposed to interrogate the jurors summoned to try them, whether they had formed or expressed an opinion of the guilt or innocence of the prisoner of the crime of murder, as charged in the indictment; but the court refused to allow the questions to be propounded, and allowed questions to be put to the jurors, whether they had formed or expressed an opinion in relation to the issues made by the special pleas, and whether they had expressed or held any personal bias, animosity, or ill or good will to the defendant. To this ruling the prisoner excepted, and now assigns it for error.

It is very clear that the ruling was correct. The office of the jury in this matter was to try issues wholly distinct from the

question whether the prisoner was guilty or innocent of the crime charged in the indictment. It was a single and separate issue, upon the determination of which it cannot be presumed that any prepossessions they may have entertained in relation to her guilt or innocence of the crime of which she was charged could influence their minds. To such a case, the examination of jurors, which prevails in practice in capital cases in this state, has no application.*

Again, it is assigned for error that the court refused to give the instructions asked in behalf of the prisoner on the trial of the special issues, and that the court gave instructions in lieu of those which are alleged to be erroneous.

The first and second instructions, as asked for the prisoner, were substantially given in the first and second instructions given by the court, and in a more accurate and intelligible form for the direction of the jury. The third, as asked for the prisoner, states that the court has not the power, in a capital case, to discharge the jury after the evidence is closed, and the case submitted to the jury, and no verdict is rendered, upon the ground that the jury say that they are unable to agree on a verdict, and such a discharge would operate as an acquittal. The instruction granted in lieu of this states, in substance, that, under such circumstances, the court has not the power to discharge the jury upon the ground that *they say* that they are unable to agree upon a verdict, and that such discharge, upon that ground alone, would entitle the defendant to an acquittal; but that the court has the power to discharge the jury in such case, when there is a legal necessity for so doing. This qualification was not only more correct, as a general rule, than that asked in behalf of the prisoner, but it was more applicable to the state of evidence touching the question before the jury, which showed that the discharge was a matter of necessity, inasmuch as the term of the court was within a few minutes of its expiration when the jury returned into court and made known their inability to agree, and were discharged.

The fourth instruction states that, under the circumstances set forth in the first instruction, the court has no power to dis-

* Wharton Am. Cr. Law, 3015, and cases.

charge the jury, unless on account of some "*actual, positive, pressing necessity.*" These terms are objectionable, because they were calculated to mislead the jury when applied to the circumstances of the case before them. The court, therefore, properly qualified the instruction by using the words "unless on account of some *legal necessity.*"

For the same reason, the fifth instruction was properly refused. It states that the mere fact that the term of the court was about to expire was not such a necessity as would justify the court in discharging the jury. The court, on the contrary, instructed that the fact that the term of the court was about to expire within a few moments, without the jury having agreed, or being able to agree, on a verdict, was such a legal necessity as would justify the discharge of the jury. This was correct as a legal rule, and it was plain and pertinent to the evidence upon which the jury had to act.

The first and third instructions given at the instance of the state contain a more full reference to the circumstances of the discharge of the jury, as shown by the evidence, and are manifestly correct.

But it is insisted that the second instruction in behalf of the state is erroneous, in directing the jury that if the record in evidence satisfied them that the court discharged the jury on the previous trial of the prisoner, and ordered a mistrial to be entered, that record is conclusive evidence (if there be nothing in the record itself to contradict the presumption) of the fact that the court properly exercised its discretion, and that a case of necessity for the discharge existed, &c.

If it were conceded that this instruction is not correct in stating the legal presumption in favor of the act of the court, and the force and effect of the record, yet it would not be error of which the plaintiff in error could complain, since the statements of the record are amply sufficient to justify the action of the court in discharging the jury, and there was no evidence adduced tending in any degree to impair or destroy the force of the facts stated in the record, or of the act of the court in discharging the jury. Hence, under such circumstances, it was immaterial that the court instructed the jury as to the conclu-

sive character of the record; for it was, of course, conclusive when there was no evidence offered to impeach it, whether such evidence would have been competent or not, if offered; and the instruction did no prejudice to the plaintiff in error.

The next assignments of error which we will consider are those relating to the instructions given at the instance of the state, and those asked in behalf of the prisoner, and either refused or modified.

The principal ground of error in these instructions insisted on, is those parts of the fourth, fifth, sixth, and seventh for the state, which hold that if the jury were satisfied from the evidence that the prisoner was an accessory before the fact in the commission of the crime charged, they should find her guilty as charged in the indictment. This qualification was also added by the court to the fifth, tenth, and thirteenth instructions given by the court, by way of modification of the instructions asked in behalf of the prisoner.

It will be observed that the prisoner was charged in both counts of the indictment as principal, and not as accessory; and the question is, whether it was competent to find a verdict of conviction against her under this indictment, if the jury should be satisfied from the evidence that she was guilty as accessory before the fact.

The rule is well settled at common law that this could not be done. Rex. v. Winfried and Thomas Gordon, 1 Leach, 515; 1 East C. L., 352; Rex v. Plant, 7 Carr. & P., 575; Hughes v. The State, 12 Ala. R., 458.

This rule was probably considered by the able and learned judge who tried this case, as altered by the provision of the Rev. Code, 572, art. 2, that "every person who shall be an accessory to any murder or other felony, before the fact, shall be deemed and considered as principal, and indicted and punished as such, and this whether the principal has been previously convicted or not." But this statute cannot be applied to this case, since the crime was committed before the statute was in force; and it is expressly provided by the Revised Code, which contained the first enactment of the provision, that no offense committed previous to the time when the acts therein contained should take

effect, and no indictment or prosecution pending at the time said acts should take effect, should be affected by the adoption of the Code, but should remain subject to the laws in force before the said Code should take effect, except that all proceedings had after the Code should take effect, should be conducted according to its provisions. Rev. Code, 44, art. 6. From this it is plain that, while the modes and forms of procedure upon indictments or prosecutions for offenses previously committed should be according to the provisions of the Code, yet the position of parties charged with such offenses, as to all substantial rights of defense, remained subject to the laws existing before the Code went into operation.

The matter here involved was a substantial right of the prisoner, and not a mere question of form of proceeding. By the law in force at the time of the commission of the alleged crime, she was not subject to conviction as an accessory before the fact upon the indictment charging her only as principal, but was entitled to be informed by the indictment what degree of guilt she was charged with, and what offense in law she was called on to answer. This was a valuable right. But to make the statute under consideration applicable to her case, would be to impair the right of defense existing by the law in force at the time the act was committed; and this, we think it clear, the legislature did not intend to do. If this view be correct, it follows that the instructions are erroneous in the particulars above stated.

But it is insisted by the attorney-general that, though this be error, yet it shall not cause a reversal, because the evidence clearly showed that the verdict was right. We do not deem it proper to express any opinion upon the sufficiency of the evidence to sustain the verdict. But it is a sufficient objection to this view, that it is a case depending on circumstantial testimony, in which it is not clearly apparent whether the jury found their verdict upon the belief that the prisoner was guilty as principal or as accessory. In order to maintain the position contended for, it would have to appear clearly from the record that the jury found or should have found their verdict upon the former view, and not upon the latter. The rule is, that where an instruction which is erroneous is given upon a material point in

the cause, a judgment rendered in accordance with it will be reversed, unless it manifestly appear, from the whole record, that no prejudice was done to the party complaining, and that the judgment was clearly correct. But, in cases depending on circumstantial evidence, which are rarely ever so presented as to be entirely clear of doubt, which, from their nature, require the greatest circumspection and caution, as well from the courts as the jury, and in which the judgment of the jury upon the facts is so conclusive of the case, it is of the highest importance that the jury be not misdirected as to rules of law; for a case of that nature will but rarely occur, where an appellate court can say that the jury were not influenced by the erroneous instruction. We cannot say so in this case, and hence cannot adopt the view presented.

In other respects, there is no error in the action of the court in giving, refusing, and modifying the instructions.

It is again assigned for error that the court overruled the prisoner's objection to the testimony of the witness La Fayette Jones, her master, in relation to her conduct and deportment towards the witness, or his wife or family, what she may have said expressing content or discontent towards him or his family, or of her situation and condition of kindness or unkindness towards himself and family, and all acts of obedience or disobedience, subordination or insubordination, in the witness' family. The answers of the witness were pertinent to these inquiries.

We think that this testimony was proper and competent, as tending to show the state of feeling of the prisoner, and as connected with the question of motive on her part to commit the act charged against her.

Another error assigned is the refusal of the court to allow the prisoner's counsel to interrogate the witness Jones, on cross-examination, to show that his slave Eliza, who was on his plantation at the time of the poisoning, had been recently before that time his cook, but was then put out into the field to work, had previously stated, shortly after Jones' marriage to his present wife, that she had poisoned his first wife, and that she would soon put her present mistress under ground; and whether the witness, on hearing these statements, had not arrested the slave

Eliza, with intent to deliver her to the officers of the law for punishment, on the charge of poisoning his first wife; and, further, whether the witness had not been, for some time prior to the poisoning in this case, in the habit of sexual intercourse with said Eliza; and also, whether, on the day of purchasing the prisoner, and on the day before the poisoning in this case, the witness had sexual intercourse with the prisoner.

As to the proposed examination with reference to the slave Eliza, it is evident that the ruling of the court was correct. No fact is shown tending to connect her with the poisoning in this case. She was working on the plantation and in the field, and was not in the kitchen or about the house; and she is not shown to have had any opportunity to commit the act. Her statements, therefore, in relation to a previous poisoning, and her intention to commit the crime again, were clearly irrelevant. So, also, was the proposed examination as to the witness' sexual intercourse with the slave Eliza.

With respect to the question as to the witness' intercourse with the prisoner, it is to be observed that the objection to it was not made by the witness, and on the ground of the nature of the question, but by the state; and the only ground upon which the state could have made it, was that it was irrelevant. It is upon that ground that it is now contended by the attorney-general that it was inadmissible. On the contrary, it is insisted, in behalf of the plaintiff in error, that the testimony sought by the question was relevant, with reference to the point of motive on her part to commit the crime, and tended to show that, if the witness was in the habit of sexual intercourse with her while she was in his family, and about the time of the poisoning, that she was not discontented with her condition, and could have had no malice to lead her to commit the crime; and that it was calculated to rebut the testimony on the part of the state, introduced for the purpose of showing her discontent with her condition, and of thereby laying the foundation for malice on her part. In this point of view, and for this purpose alone, we think that the question was competent, and should have been allowed by the court, leaving it for the jury to determine whether, if answered in the affirmative, it was a sufficient an-

swer to the imputation of malice on her part against Mrs. Jones, on account of the chastisement which she had caused to be inflicted upon her, or, perhaps, on account of the alleged sexual intercourse of her husband with the prisoner, or against Jones himself, in consequence of his having chastised her on the morning of the poisoning, and thereby changed her alleged kind feelings to those of revenge against him.

Again, it is insisted, that the court erred in overruling the prisoner's objection to that part of the testimony of the witness Jones, in which he said, that the prisoner, when examined as a witness on the trial of George for the same offense, stated that when she was coming up on the steamer Ingomar, from New Orleans, to Jones' house, after his purchase of her, she took from a girl on the boat some free papers.

We do not perceive how this testimony could have worked a prejudice to the prisoner, and therefore its admission would not alone justify a reversal of the judgment. But it was objectionable, because it was her statement, made while under examination, on oath, on the trial of George, in relation to the crime with which she was also charged; and it was, therefore, not competent evidence on her trial. 1 Archb. Cr. Prac. & Plead. (by Waterman, 6th ed., 1853), 126, 127, and cases cited in notes.

Several errors are assigned in relation to objections made in the court below, to the validity of the indictment, by motion to quash it, objection to reading it, motion in arrest of judgment, and the like.

All these objections are founded on the position, that the record does not show that the indictment was returned into court by the foreman of the grand jury, in the presence of the grand jury.

Without a particular statement of the grounds of these proceedings, we deem it sufficient to say, that the rulings of the court upon them were correct.

With reference to the assignments, because of the refusal of the court to quash the indictment on the ground of insufficiency of its averments, for misjoinder of counts, and the refusal of the court to compel the district attorney to elect upon which of the counts of the indictment he would try the prisoner, it is suffi-

cient to say, that they have already been decided to be untenable in the case of George v. The State, at the last term.

There are several assignments of error, having reference to particular circumstances which occurred on the trial and connected with it, such as objections to the *venire facias ;* and to proceeding to trial, on account of the insufficient time of service of a copy of it on the prisoner; objections to the qualification of a juror; and the refusal of applications for continuance. These objections depend upon special circumstances attending the trial, and as they are of but little importance in principle, and will not be likely to arise again upon a future trial of the case, we consider it unnecessary to state our opinion in relation to them.

. The last assignment of error which we will notice, is that raising an objection to the jurisdiction of the court, on the ground that the prisoner was not tried before two justices of the peace, before she was indicted in the circuit court. This objection is based on the statute, Rev. Code, 250, which provides, that for all offenses not charged to be capital, slaves and free negroes, except in particular cases, shall be tried before two justices of the peace and five slaveholders. It is manifest that this statute has no application to offenses *charged to be capital ;* and the only provision in it, in reference to such cases, is that which directs that, if, upon investigation, it shall appear to the justices and slaveholders that the slave so tried by them is guilty of any crime punishable with death, by the laws of this state, the slave shall be committed for trial by the circuit court. But this clearly has reference to a case where the slave is *charged* with an *offense not capital,* and it appears, on examination by the tribunal, to be a capital case. There is, therefore, no just ground for this assignment.

With regard to the assignment presenting for review the sufficiency of the evidence to support the verdict, we deem it improper to express an opinion, because, for the errors above stated, the judgment will be reversed, and a new trial awarded; and an expression of our opinion on this point might prejudice the determination of the case upon the new trial.

Judgment reversed, and cause remanded for a new trial.